## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| Erine Raybon-Rojas, | |
| Plaintiff, | |
| | CIVIL ACTION NO.: |
| v. | |
| Northeast Georgia Health System, Inc., | JURY TRIAL DEMANDED |
| Northeast Georgia Physician Group, Inc., and Konstantin Zubelevitskiy, | |
| Defendants. | |

## COMPLAINT

## INTRODUCTION

1.      This case is about a hospital system with glass ceilings.

2.      Plaintiff Erine Raybon-Rojas is a triple board-certified physician with a sterling record of medical and administrative achievements for her employer, Northeast Georgia Physician Group ("NGPG"). She is also an African-American woman and, unfortunately, those two facts have had far more of a pivotal role in her employment than they should.

3.      NGPG is the physician employment group for the Northeast Georgia Health System, and the health system it supports is plagued by systemic racial and gender-based discrimination. While the health system employs a number of minority and women physicians, those same doctors are largely shut out of leadership

1

positions and high-profile opportunities to advance their careers inside the health system.

4.     Dr. Raybon-Rojas therefore brings this action to rectify these inequities and obtain declaratory and injunctive relief, back pay and lost benefits, front pay, liquidated damages, compensatory damages, statutory damages, punitive damages, and attorneys' fees and costs of litigation.

## PERSONAL JURISDICTION

5.     This Court has specific personal jurisdiction over Defendants because the acts and omissions giving rise to Dr. Raybon-Rojas's claims occurred in the State of Georgia.

6.     This Court also has general jurisdiction over NGPG and Dr. Konstantin because the defendants are respectively incorporated in or citizens of Georgia.

## SUBJECT MATTER JURISDICTION AND VENUE

7.     Dr. Raybon-Rojas's claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a).

8.     This Court is a proper venue for Dr. Raybon-Rojas's claims under 28 U.S.C. § 1391(b) and (c), as a substantial part of the events giving rise to Dr. Raybon-Rojas's claims occurred in this District.

## THE PARTIES

9.     Plaintiff Erine Raybon-Rojas is a citizen and resident of Georgia.

10.     Defendant Northeast Georgia Physician Group, Inc. is a Georgia corporation with its principal place of business located at 743 Spring St. N.E., Gainesville, GA, 30501. NGPG may be served through its registered agent, Andrei Boyarshinov, at 743 Spring St. NE, Legal Department, Gainesville, GA, 30501.

11.     Defendant Northeast Georgia Health System, Inc. is a Georgia corporation with its principal place of business located at 743 Spring St. N.E., Gainesville, GA, 30501. NGPG may be served through its registered agent, Andrei Boyarshinov, at 743 Spring St. NE, Legal Department, Gainesville, GA, 30501.

12.     Defendant Konstantin Zubelevitskiy is a citizen of Georgia, and Dr. Raybon-Rojas is not presently aware of his home address.

## FACTUAL ALLEGATIONS

13.     Northeast Georgia Health System is one of the largest medical care providers in North Georgia, with more than 1,000 medical professionals providing patient care across dozens of clinical specialties.

14.     Northeast Georgia Health System employs physicians through a separate corporation: NGPG.

15.     Dr. Raybon-Rojas is a triple board-certified physician in the pulmonology and critical care medicine group for Northeast Georgia Health System. Dr. Raybon-Rojas graduated from the Ross University School of Medicine in 2008.

3

She then completed her residency in internal medicine at Wayne State University/Henry Ford Health System.

16.    Following her residency, Dr. Raybon-Rojas completed a fellowship in pulmonology and critical care medicine at Wayne State University/Henry Ford Health System in 2015. She received her board certification for internal medicine in 2013, board certification for pulmonary disease in 2015, and her board certification in critical care medicine in 2017.

17.    Despite her uniformly positive performance reviews and performance metrics, Defendants have sidelined Dr. Raybon-Rojas, diminished her responsibilities, blocked her appointment to positions inside NGPG, adversely affected her career trajectory, and are actively scheming to create a pretextual justification to terminate her employment.

## NGPG's Structure

18.    NGPG employs medical care providers in a large number of specialties. Each clinical specialty is overseen by a Medical Director, who is a physician. The Medical Directors then report to a Director.

19.    While the entire physician population at NGPG is diverse and roughly 35% women, there is a precipitous drop-off in non-white, non-male physicians in leadership positions.

20.     Upon information and belief, approximately 90% of all in-patient medical directors and associate medical for NGPG are men, and women of color are almost entirely unrepresented in leadership roles.

21.     NGPG as a whole is overseen by Daniel Tuffy, the Chief Executive Officer of NGPG, a white male.

22.     Upon information and belief, each physician employed by NGPG signs an employment agreement with NGPG setting that physician's compensation and activities.

23.     Full-time physicians have 1.0 units of availability, representing a full-time position. The contract then provides various service subcategories making up the physician's full-time role. For example, a physician may be allocated 0.5 to shifts in his or her specialty and 0.5 for administrative duties, or 0.5 to shifts in one clinical specialty, and 0.5 shifts in another specialty also held by that physician.

**NGPG Denies Dr. Raybon-Rojas Promotion Opportunities**

24.     Beginning in or around 2018, Dr. Raybon-Rojas began performing the activities and duties associated with the Assistant Medical Director of Critical Care position.

25.     In 2021, NGPG fired the acting Medical Director of Critical Care. Following that physician's termination, Dr. Raybon-Rojas had several conversations

with Mr. Tuffy regarding Dr. Raybon-Rojas continuing as the Assistant Medical Director position.

26.     During those conversations, Mr. Tuffy assured Dr. Raybon-Rojas that she would receive this role, as she had been in her current role for approximately one-and-a-half years and had already been performing the Assistant Medical Director position.

27.     Mr. Tuffy told Dr. Raybon-Rojas that, as part of her upcoming contract renewal, he would add that position to her contract.

28.     When Dr. Raybon-Rojas received her amended contract, the contract did not contain any indication that she would be the Assistant Medical Director. Over the following months, Dr. Raybon-Rojas repeatedly contacted various NGPG personnel in an attempt to have her contract match what Mr. Tuffy had promised— only to receive no clear response.

29.     Near the deadline to execute the amended contract, Dr. Raybon-Rojas had a meeting with Dr. Bedri Yusuf, the head physician for NGPG. Rather than address Dr. Raybon-Rojas's concerns, Dr. Yusuf recommended that Dr. Raybon-Rojas meet with Mr. Tuffy to discuss her potential eligibility for the Assistant Medical Director conversation. Dr. Yusuf also told Dr. Raybon-Rojas that it would be "unfair" to appoint her to this position without some kind of open application process.

30.    Later in 2021, NGPG fired its Surgical Medical Director. NGPG promoted a white male physician to the position without any open application process.

31.    Dr. Raybon-Rojas raised this inexplicable difference to Dr. Yusuf. After the Surgical Medical Director appointment occurred, Dr. Raybon-Rojas told Dr. Yusuf that she felt like there was a double standard. Dr. Raybon-Rojas reminded Dr. Yusuf he had previously told her that NGPG was instituting a formal process and that process hadn't been followed. Dr. Raybon-Rojas then told Dr. Yusuf, "One could say that there's a very big difference and the difference is that I'm a black female."

32.    Dr. Yusuf responded by saying something to the effect of, "I see how you could think that."

33.    Dr. Raybon-Rojas responded, "So the process wasn't the same."

34.    Dr. Yusuf did nothing to investigate this clear allegation of discriminatory treatment made by Dr. Raybon-Rojas.

35.    Dr. Yusuf and Mr. Tuffy deployed this double standard with other physicians. For instance, Dr. Yusuf and Mr. Tuffy had similar conversations with a minority female surgeon who was denied a leadership position in graduate medical education and as a Medical Director or Assistant Medical Director. The physician later resigned.

7

36.     Moreover, Dr. Yusuf has repeatedly expressed his belief that women physicians are less capable than male physicians or treated women physicians differently because of their gender. For instance:

a.  During a physician meeting, Dr. Yusuf stated that women physicians are not in leadership roles because of their household responsibilities;

b.  Dr. Yusuf told a physician that she would end up divorced if she continued to behave in certain manners at work. The physician later resigned from her leadership role in NGPG because of the discriminatory treatment she faced. Even after stepping down from this leadership position, this physician has continued to experience harassment and poor treatment from NGPG leadership.

c.  Dr. Yusuf said in a group meeting that a female physician needed to fix her hair and makeup before she came on camera to be presentable for the group.

37.     Indeed, Dr. Yusuf and Mr. Tuffy have dealt with so many discrimination complaints regarding NGPG's unlawful personnel decisions that they've developed a stock line to respond to them. When (accurately) accused of discrimination against women or minority physicians, Dr. Yusuf and/or Mr. Tuffy will respond that they could not have engaged in discriminatory leadership decisions because they have hired women or minority physicians in the past.[1]

---

[1] Separately, Dr. Yusuf will claim that he cannot discriminate against other black physicians because he is black.

**Dr. Raybon-Rojas is pushed out of a fellowship program she created**

38.    Beginning in 2021, Dr. Raybon-Rojas began working on creating a pulmonology and critical care fellowship at Northeast Georgia Health System.

39.    The accreditation process for a medical fellowship is extremely rigorous and time-intensive. Physicians who are leading the fellowship accreditation process normally receive a 50% reduction in their clinical schedule due to the additional workload required by this process.

40.    Dr. Raybon-Rojas did not receive any administrative credit or reduction in her shift hours for her role in the fellowship accreditation process. Upon information and belief, other white and/or male physicians who led fellowship accreditation processes received administrative adjustments to their clinical work schedules.

41.    In late 2021, NGPG hired Dr. Zubelevitskiy, a white male, as the Medical Director of Clinical Care. Dr. Raybon-Rojas had expressed interest in this position before it was filled, but Dr. Yusuf discouraged her from applying because he did not think she would be "supported" in this role and made it clear that NGPG did not want her to apply for this position.

42.    Dr. Yusuf discouraged Dr. Raybon-Rojas from applying to this position even though she had spent nearly one year acting as the interim lead for the critical care team after the prior Medical Director had been terminated.

43.     Soon after joining NGPG, Dr. Zubelevitskiy began targeting Dr. Raybon-Rojas for poor treatment. Upon information and belief, he did so because Dr. Raybon-Rojas is a black female physician.

44.     In March 2022, Dr. Raybon-Rojas achieved the milestone of successful accreditation for the pulmonology and critical care fellowship. The normal practice at NGPG is that the physician who obtains accreditation for a fellowship stays on as the Program Director for the Fellowship and selects the Associate Program Directors.

45.     Dr. Raybon-Rojas held an open application process for the two available openings for Associate Program Directors. Each applicant was then interviewed by a panel of physicians in the pulmonology and critical care specialties.

46.     That open and collaborative process resulted in the selection of Dr. April McDonald (black female) and Vijay Ramalingham (south Asian male), both of whom were preferred by a supermajority of the panelists.

47.     Throughout this process, Dr. Zubelevitskiy began taking active measures to undermine Dr. Raybon-Rojas and push her out of the program that she created.

48.     Dr. Zubelevitskiy attacked Dr. Raybon-Rojas's competence and job performance and told other physicians that she was ignoring his concerns about the clinical care components of the fellowship. He also held a closed-door meeting with

other physicians where, upon information and belief, he made numerous false statements to compromise Dr. Raybon-Rojas's position as the fellowship director.

49.    Dr. Raybon-Rojas then discussed her concerns about the inequitable treatment she was experiencing with Dr. John Delzell and said that the treatment she was receiving would not be happening if she "looked differently." Dr. Delzell likewise acknowledged that she was not being treated fairly.

50.    In or around October 2022, as a result of Dr. Zubelevitskiy's smear campaign, the Chief Operating Officer of Northeast Georgia Health System, Michael Covert, scheduled a meeting with Dr. Raybon-Rojas. Mr. Covert told Dr. Raybon-Rojas that certain physicians had raised questions regarding her suitability for the fellowship director position and if she was qualified.

51.    Dr. Raybon-Rojas was entirely qualified for the fellowship director position as a board-certified physician in both fellowship clinical specialties and as the physician *who led and obtained the accreditation for this fellowship*.

52.    Mr. Covert specifically told Dr. Raybon-Rojas that these concerns had been raised by Dr. Zubelevitskiy. Dr. Zubelevitskiy had not, however, directly expressed these concerns to Dr. Raybon-Rojas.

53.    Mr. Covert also said that Dr. Zubelevitskiy told him that he did not have any say in the Associate Program Director selections. That was false; Dr.

Zubelevitskiy sat in on all of the panel interviews for the Associate Program Director positions.

54.    The health system then made the inexcusable decision to cancel the recently accredited fellowship—an unprecedented decision that, upon information and belief, had never occurred for another fellowship position that received accreditation at the health system—based on NGPG's complete refusal to allow Dr. Raybon-Rojas to work in this role.

55.    Following this conversation, Dr. Raybon-Rojas was devastated. She began crying and went to Dr. John Delzell's office. Dr. Delzell is the Designated Institutional Official and has oversight over all fellowships in the Northeast Georgia Health System.

56.    Yet again, Dr. Raybon-Rojas told Dr. Delzell that this would not have happened if she were a white male instead of a black female. Dr. Delzell nodded, likewise signaling his agreement that Dr. Raybon-Rojas had yet again been subject to discriminatory treatment.

57.    Multiple physicians approached Dr. Raybon-Rojas to offer their condolences. As part of those conversations, without prompting, several affirmatively raised that her race likely had a role in the decision. For instance, one physician told Dr. Raybon-Rojas that NGPG did not "want to see a black female Program Director and a black female Associate Program Director."

58.    Despite enduring pervasive discrimination and retaliation, Dr. Raybon-Rojas continued to provide excellent clinical care. In her 2022 annual review, Dr. Raybon-Rojas's reviewer, Dr. Hisham Qutob, told her that she was meeting all of her numbers, patients and staff loved her, and that he had not identified any areas for her to improve over the next year.

59.    Dr. Raybon-Rojas then asked Dr. Qutob, "Then let's talk about what happened with the fellowship." Dr. Qutob responded that shutting down the fellowship was not his decision—that was Dr. Zubelevitskiy's doing—but he declined to elaborate further.

**Dr. Raybon-Rojas reports this discriminatory treatment to NGHS HR**

60.    At the same time that NGPG and Dr. Zubelevitskiy were acting to push Dr. Raybon-Rojas out of the fellowship program she created, they were also taking steps to push her out of the organization entirely.

61.    In May 2022, NGPG suddenly placed Dr. Raybon-Rojas on a week of night shifts with only two weeks of notice. This shift was not permitted under her employment agreement with Dr. Raybon-Rojas, and she notified NGPG accordingly.

62.    Dr. Zubelevitskiy told Dr. Raybon-Rojas that he was entirely removing her from the schedule because she declined to work the night shift schedule she received.

63.    Following that exchange, Dr. Raybon-Rojas escalated the issue to Dr. Yusuf and Mr. Tuffy. In the resulting meeting, Mr. Tuffy told Dr. Raybon-Rojas that she had not done anything wrong, but he nonetheless upheld the decision to remove Dr. Raybon-Rojas from the schedule. Around the same time, Dr. Yusuf also told Dr. Raybon-Rojas that "maybe this isn't the place for [Dr. Raybon-Rojas]," a shocking escalation in response to Dr. Raybon-Rojas asserting her contractual rights.

64.    In or around August 2022, Dr. Raybon-Rojas received a call from a physician employed by NGPG [Doctor 1]. Doctor 1 told Dr. Raybon-Rojas that Doctor 1 cared about her and that she should be careful because "there are people who are trying to get you fired." Dr. Raybon-Rojas asked if the "people" Doctor 1 referenced were Dr. Zubelevitskiy and Dr. Yusuf. Doctor 1 did not respond, which Dr. Raybon-Rojas took as confirmation of her suspicions. Doctor 1 then added that Dr. Yusuf had described Dr. Raybon-Rojas as a "troublemaker."

65.    Upon information and belief, other non-black, non-female physicians who raised scheduling issues were not targeted for harassment or retaliation for exercising their contractual rights.

66.    Around the same timeframe, Dr. Raybon-Rojas received a call from another doctor [Doctor 2]. Doctor 2 likewise told Dr. Raybon-Rojas to "watch her back."

67.     In the fall of 2022, Dr. Raybon-Rojas received a message that Dr. Zubelevitskiy and Dr. Yusuf wanted to meet with her in person because of alleged concerns regarding her availability during her shifts. This purported justification for a disciplinary meeting was entirely fabricated and a pretext to discriminate and/or retaliate against Dr. Raybon-Rojas.

68.     On or about September 26, 2022, Dr. Raybon-Rojas reported the discrimination that she experienced to NGHS Human Resources because NGPG had been completely unresponsive to Dr. Raybon-Rojas's repeated complaints about discriminatory treatment and retaliation.

69.     Soon after Dr. Raybon-Rojas contacted HR, Dr. Zubelevitskiy cancelled the meeting because, upon information and belief, he knew that his attempt to discipline Dr. Raybon-Rojas had no factual basis. Neither Dr. Zubelevitskiy nor Dr. Yusuf attempted to reschedule this meeting afterwards because no legitimate concern regarding her availability during shifts existed.

70.     Later in September or early October, Dr. Raybon-Rojas met with the interim Chief Human Resources Officer, and Mary McNeil, a Human Resources Business Partner for Northeast Georgia Health System. During the roughly one-hour meeting, Dr. Raybon-Rojas provided a summary of the discriminatory and retaliatory treatment she had endured at NGPG and specifically complained that she was being bullied and retaliated against because of the way that she looked.

71.    HR asked if Dr. Raybon-Rojas believed that Dr. Yusuf had a problem with women. Dr. Raybon-Rojas responded that she could identify roughly 10 women physicians who left NGPG because of inequitable treatment.

72.    Upon information and belief, NGPG failed to conduct any investigation into Dr. Raybon-Rojas's complaints regarding her and other physicians' experiences.

73.    Rather than appropriately respond, Northeast Georgia Health System made the baffling decision to ask for a sit-down meeting between Dr. Raybon-Rojas, Dr. Zubelevitskiy, and Dr. Yusuf—the exact individuals responsible for the extensive complaints identified by Dr. Raybon-Rojas.

74.    Upon information and belief, neither Northeast Georgia Health System nor NGPG conducted an investigation into Dr. Raybon-Rojas's allegations of discrimination, harassment, and retaliation.

75.    Dr. Raybon-Rojas then had a meeting with Diane Poirot, the new Chief Human Resources Officer, HRPB Mary McNeil, Dr. Yusuf, and Dr. Cliff Hastings, a cardiothoracic surgeon who Dr. Raybon-Rojas requested as a neutral physician to attend the meeting.

76.    During that meeting, Dr. Raybon-Rojas again chronicled the discriminatory and inequitable treatment she faced. And again, neither Northeast

Georgia Health System nor NGPG conducted an investigation into Dr. Raybon-Rojas's allegations of discrimination, harassment, and retaliation.

77.    Instead, upon information and belief, the only action taken by NGPG was to credit her for shifts that she had been removed from, which was a clear violation of her employment agreement.

### NGPG Employees Revolt Against Dr. Zubelevitskiy

78.    Dr. Zubelevitskiy seemed undeterred from his efforts to orchestrate a justification to fire Dr. Raybon-Rojas. In early 2023, a physician told Dr. Raybon-Rojas that Dr. Zubelevitskiy had told him to "watch this, the clock starts now" in reference to Dr. Raybon-Rojas's employment with NGPG.

79.    But Dr. Zubelevitskiy became embroiled in his own HR problems. A group of Advanced Practice Providers and physicians sent an email cataloguing his inappropriate and retaliatory conduct.

80.    Yet again, rather than conduct any kind of meaningful investigation, NGPG arranged for a "town hall" meeting led by Dr. Yusuf designed to mollify the employee population while taking no action.

### NGPG forces Dr. Raybon-Rojas to re-accredit the fellowship she supposedly lacks the ability to lead

81.    In or around November 2023, Dr. Raybon-Rojas had another difficult conversation with Dr. Delzell. Dr. Delzell flatly told Dr. Raybon-Rojas that she should consider resigning from the fellowship director position. Dr. Delzell made it

clear that Dr. Zubelevitskiy would not tolerate Dr. Raybon-Rojas remaining in the position, and he would continue to directly and indirectly undermine the program as long as she led it. At the same time, Dr. Delzell directly acknowledged that nothing she did warranted her removal from the fellowship program she created.

82.     Dr. Raybon-Rojas broke down after this blunt but accurate assessment of her predicament. Dr. Raybon-Rojas had run headfirst into NGPG's color barrier and glass ceiling. She was scrutinized for trivial issues that other, non-black, non-male physicians were not, and NGPG had decided to kill a fellowship program rather than see a black woman lead it.

83.     NGPG and graduate medical education revived the fellowship program and selected Dr. Vijay Ramalingham as the future fellowship director.[2] And, with that change, Dr. Zubelevitskiy suddenly went from stymying the program to giving it his full backing.

84.     NGPG then had Dr. Raybon-Rojas do the accreditation process again. She again succeeded in getting the fellowship accredited.

85.     Roughly two weeks before the site visit, NGPG removed Dr. Raybon-Rojas's name from the program.

---

[2] Dr. Raybon-Rojas does not claim that Dr. Ramalingham was unqualified for the position but, rather, that his appointment in this role and the subsequent change in support demonstrates unlawful discrimination.

86.    Despite erasing her name from the fellowship program, Dr. Raybon-Rojas played such a pivotal role in the accreditation of this fellowship that NGPG asked her to also attend the site visit by the Accreditation Council for Graduate Medical Education ("ACGME"), the body responsible for accreditation of graduate medical training programs.

87.    Being asked to attend the site visit by ACMGE is a significant request. Only a handful of individuals participate in the site visit.

88.    When the ACGME conducted the site visit, they were perplexed why Dr. Raybon-Rojas was not going to be the fellowship director and asked why she would not be in that role.

89.    The question was so obvious that NGPG/graduate medical education anticipated it and formed a plan for how to respond before the site visit. The false answer they landed on would be to claim that Dr. Raybon-Rojas was "focused on DEI" and could not be the fellowship director.

90.    When NGPG and graduate medical education proposed that response, Dr. Raybon-Rojas responded, "Oh, so that's what we're saying."

91.    Other physicians likewise recognized this as a farce. Around the same time, one physician told Dr. Raybon-Rojas, "I can't imagine being a black woman in this environment," or something to that effect.

**NGPG plots to create a pretextual justification to fire Dr. Raybon-Rojas**

92.     With the program accreditation secured, Dr. Zubelevitskiy renewed his campaign to create a false justification to fire Dr. Raybon-Rojas.

93.     Due to family and personal medical issues, Dr. Raybon-Rojas requested and received intermittent FMLA in 2024 and through February 2025.

94.     In December 2024, Dr. Zubelevitskiy and Mr. Tuffy repeatedly other NGPG personnel about her arrival and departure times related to shifts, as well as the time she spent in the unit during shifts. Dr. Raybon-Rojas found the questions puzzling, because it was and is a common practice for physicians to leave slightly before a scheduled shift ended.

95.     Moreover, other medical staff had specifically noted that Dr. Raybon-Rojas was one of the few physicians who spent all or most of their shift in the unit, so this concern about Dr. Raybon-Rojas's activities during her schedule struck her as off.

96.     Her suspicions were confirmed by another flurry of calls from her concerned colleagues telling her that she was yet again being targeted.

97.     In or around December 2024, Dr. Qutob told Dr. Raybon-Rojas to be careful because Dr. Zubelevitskiy and Mr. Tuffy were tracking her key card activity. Dr. Qutob told her that Dr. Zubelevitskiy had called several nurses to ask about her arrival and departure times and expressed that he seemed to be trying to "build a case" to fire her.

98.    In mid-February 2025, Dr. Raybon-Rojas received another call from Doctor 2. Doctor 2 likewise told her to be "careful" because Dr. Zubelevitskiy and Mr. Tuffy were tracking her time. Doctor 2 told her, "I need you to be careful when you come and when you go." Doctor 2 then stated that Dr. Raybon-Rojas should not ask how Doctor 2 knew this, but Doctor 2 was aware that Dr. Zubelevitskiy and Mr. Tuffy were tracking Dr. Raybon-Rojas's badge swipes "as a means to have something on [her]."

99.    On information and belief, NGPG did not review key card records for other physicians, even though there are other, non-black, non-female physicians who regularly leave shifts early or spend inadequate time in the unit during shifts.

100.    On information and belief, NGPG is actively searching for a pretextual justification to fire Dr. Raybon-Rojas because of her prior discrimination complaints, to discriminate against her on the basis of her race and gender, and/or to retaliate against her for exercising her rights under the FMLA.

**NGPG's discriminatory practices are not limited to Dr. Raybon-Rojas**

101.    NGPG has a recognized preference for white men in leadership positions and in denying minority employees leadership positions.

102.    Three physicians of Indian descent have filed a complaint against NGPG for discrimination and retaliation in a case styled as *Pareek* et al. *v. Northeast*

*Georgia Physicians Group, Inc.* et al., No. 2:25-cv-00027-RWS (N.D. Ga.) (*Pareek*).

103.   In that lawsuit, the *Pareek* plaintiffs allege that NGPG and Mr. Tuffy retaliated against them for engaging in protected activity and opposing the rampant discrimination present at NGPG.

104.   The *Pareek* plaintiffs also allege that NGPG created pretextual justifications to terminate NGPG personnel.

105.   Many other physicians have raised complaints regarding NGPG's blatant preference for men—especially white men—in leadership roles or disproportionately harsh treatment of minority physicians, or expressed their belief that NGPG is biased against women and women of color.

106.   Defendants are likewise engaged in a similar exercise to discriminate and retaliate against Dr. Raybon-Rojas while fabricating a pretextual justification for their actions.

107.   Contemporaneously with filing this Complaint, Dr. Raybon-Rojas has filed a Charge of Discrimination with the EEOC and immediately requested the issuance of the right-to-sue letter.

**COUNT I**
**42 U.S.C. Section 1981 (Racially Hostile Work Environment)**
**Against All Defendants**

108.   Dr. Raybon-Rojas incorporates by reference Paragraph Nos. 1-107 of her Complaint.

109.   Dr. Raybon-Rojas is a member of a protected class under 42 U.S.C. § 1981 because she identifies as Black.

110.   NGPG is Dr. Raybon-Rojas's employer.

111.   NGHS jointly employs Dr. Raybon-Rojas through its management of NGPG and the interrelationship between the operation of the health system and employment of NGPG physicians.

112.   NGPG and Dr. Raybon-Rojas are parties to an employment agreement.

113.   Dr. Konstantin is in a managerial position regarding the terms and conditions of Dr. Raybon-Rojas's employment.

114.   Pursuant to 42 U.S.C. § 1981, all persons within the jurisdiction of the United States shall have the same right to make and enforce contracts and shall be given the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

115.   Dr. Raybon-Rojas performed her contractual obligations.

116.   NGPG and Dr. Konstantin subjected Dr. Raybon-Rojas to a severe and pervasive, racially hostile work environment.

117.   NGPG and Dr. Konstantin violated Dr. Raybon-Rojas's rights under Section 1981 by, among other things, failing to take immediate and appropriate

action in response to a hostile work environment of which the employer knew, creating and subjecting Dr. Raybon-Rojas to a racially hostile work environment, and failing to take preventative or corrective measures.

118.    As the but-for and proximate cause of Defendants' actions, Dr. Raybon-Rojas has suffered damages including emotional distress, inconvenience, attorney's fees and costs, humiliation, and other indignities.

119.    Defendants undertook their actions intentionally and maliciously with respect to Dr. Raybon-Rojas and her federally protected rights.

120.    Dr. Raybon-Rojas is entitled to damages against Defendants, including compensatory damages, punitive damages, attorneys' fees, and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT II
### 42 U.S.C. Section 1981 (Race Discrimination)
### Against All Defendants

121.    Dr. Raybon-Rojas incorporates by reference Paragraph Nos. 1-107 of her Complaint.

122.    Dr. Raybon-Rojas is a member of a protected class under 42 U.S.C. § 1981 because she identifies as Black.

123.    NGPG is Dr. Raybon-Rojas's employer.

124.   NGHS jointly employs Dr. Raybon-Rojas through its management of NGPG and the interrelationship between the operation of the health system and employment of NGPG physicians.

125.   NGPG and Dr. Raybon-Rojas are parties to an employment agreement.

126.   Dr. Konstantin is in a managerial position regarding the terms and conditions of Dr. Raybon-Rojas's employment.

127.   Pursuant to 42 U.S.C. § 1981, all persons within the jurisdiction of the United States shall have the same right to make and enforce contracts and shall be given the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

128.   Dr. Raybon-Rojas performed her contractual obligations.

129.   Defendants violated Dr. Raybon-Rojas's rights under Section 1981 by discriminating against Dr. Raybon-Rojas, including by failing to promote her to the program director position, removing her from the fellowship program director position, subjecting her to increased scrutiny and discipline, and scheming to fabricate a pretextual justification to terminate her employment.

130.   As the but-for and proximate cause of Defendants' actions, Dr. Raybon-Rojas has suffered damages including emotional distress, inconvenience, attorney's fees and costs, humiliation, and other indignities.

131.    Defendants undertook their actions intentionally and maliciously with respect to Dr. Raybon-Rojas and her federally protected rights.

132.    Dr. Raybon-Rojas is entitled to damages against Defendants, including compensatory damages, punitive damages, attorneys' fees, and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT III
### 42 U.S.C. Section 1981
### (Retaliation and Retaliatory Hostile Work Environment)
### Against All Defendants

133.    Dr. Raybon-Rojas incorporates by reference Paragraph Nos. 1-107 of her Complaint.

134.    Dr. Raybon-Rojas is a member of a protected class under 42 U.S.C. § 1981 because she identifies as Black.

135.    NGPG is Dr. Raybon-Rojas's employer.

136.    NGHS jointly employs Dr. Raybon-Rojas through its management of NGPG and the interrelationship between the operation of the health system and employment of NGPG physicians.

137.    NGPG and Dr. Raybon-Rojas are parties to an employment agreement.

138.    Dr. Konstantin is in a managerial position regarding the terms and conditions of Dr. Raybon-Rojas's employment.

26

139.   Pursuant to 42 U.S.C. § 1981, all persons within the jurisdiction of the United States shall have the same right to make and enforce contracts and shall be given the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

140.   Dr. Raybon-Rojas performed her contractual obligations.

141.   Defendants violated Dr. Raybon-Rojas's rights under Section 1981 by retaliating against her for engaging in protected activity, including raising complaints regarding the discriminatory treatment and conditions she experienced at the health system.

142.   As the but-for and proximate cause of Defendants' actions, Dr. Raybon-Rojas has suffered damages including emotional distress, inconvenience, attorney's fees and costs, humiliation, and other indignities.

143.   Defendants undertook their actions intentionally and maliciously with respect to Dr. Raybon-Rojas and her federally protected rights.

144.   Dr. Raybon-Rojas is entitled to damages against Defendants, including compensatory damages, punitive damages, attorneys' fees, and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

**<u>COUNT IV</u>**
**FMLA Retaliation and Interference**
**Against NGPG**

145.   Dr. Raybon-Rojas incorporates by reference Paragraph Nos. 1-107 of her Complaint.

146.   Dr. Raybon-Rojas is an FMLA-eligible employee because she was employed by NGPG for at least twelve (12) months before she requested FMLA leave and was employed by NGPG for over 1,250 hours in the twelve-month period prior to his request.

147.   NGPG is an employer that is covered by the FMLA because it employed more than 50 employees in 20 or more workweeks in the current or preceding calendar year.

148.   Dr. Raybon-Rojas was entitled to FMLA leave because she or a qualifying family member had a qualifying serious health condition, and NGPG approved intermittent FMLA leave requested by Dr. Raybon-Rojas.

149.   NGPG interfered with Dr. Raybon-Rojas's exercise of her rights under the FMLA and retaliated against her by initiating a sham investigation into her work attendance and/or arrival and departure times.

150.   NGPG's actions constitute willful and unlawful retaliation and interference against Dr. Raybon-Rojas.

151.   Dr. Raybon-Rojas is entitled to equitable relief and the recovery of her attorneys' fees and costs as a result of this unlawful interference and retaliation.

**WHEREFORE,** Dr. Raybon-Rojas requests that the Court enter the following relief:

a.    declare that Defendants have violated Dr. Raybon-Rojas' rights under the federal statutes listed above;

b.    permanently enjoin Defendants from violating, in the future, Dr. Raybon-Rojas's rights under the federal statutes listed above;

c.    award Dr. Raybon-Rojas back pay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount, and front pay;

d.    award Dr. Raybon-Rojas prejudgment interest as required by law;

e.    award Dr. Raybon-Rojas compensatory damages for emotional pain and suffering;

f.    award Dr. Raybon-Rojas punitive damages against Defendants sufficient to punish them for their unlawful conduct and deter them from repeating such conduct in the future;

g.    award Dr. Raybon-Rojas her reasonable attorneys' fees and expenses; and

h.    grant such additional relief as may be just.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dr. Raybon-Rojas demands a jury trial on all issues so triable.

Respectfully submitted, this 28th day of April, 2025.

*s/ Alex Meier*
Alex Meier
Georgia Bar No. 282350
LEE MEIER
695 Pylant Street NE, Suite 105
Atlanta, Georgia 30306
Telephone: (404) 999-4798
ameier@leemeier.law

**COUNSEL FOR PLAINTIFF**
